IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL NO:   `3:13cv-370 H`

MARY JO PAYNE                                                    PLAINTIFF


VS.                          **VERIFIED COMPLAINT**


AT&T CORP.,                                                 DEFENDANTS
One AT&T Way
Bedminster, NJ  07470

     Serve:  CT Corporation System
          306 W. Main Street, Suite 512
          Frankfort, KY 40601

and

BAY AREA CREDIT SERVICE, LLC.,
1000 Abernathy Road
Building 400, Suite 195
Atlanta, GA  30328

     Serve:  Office of the Secretary of State
          Summonses Branch
          700 Capital Ave., Suite 86
          Frankfort, KY  40601

and

SOUTHWEST CREDIT SERVICES, LP,
4120 International Pkwy., #1100
Carrollton, TX  75007

     Serve:  CT Corporation System
          306 W. Main Street, Suite 512
          Frankfort, KY 40601

and

AFNI, INC.,
404 Brock Drive
Bloomington, IL  61701

      Serve:  CT Corporation System
           306 W. Main Street, Suite 512
           Frankfort, KY 40601

and

I.C. SYSTEM, INC.,
444 Highway 96 East
St. Paul, MN, 55127-2557

      Serve:  CT Corporation System
           306 W. Main Street, Suite 512
           Frankfort, KY 40601

**JURY TRIAL DEMANDED**

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Comes now the Plaintiff, MARY JO PAYNE, by and through undersigned counsel, and for her Complaint against Defendants, AT&T CORP., BAY AREA CREDIT SERVICE, LLC, SOUTHWEST CREDIT SYSTEM, LP, AFNI INC., and I.C. SYSTEM, INC., alleges and affirmatively states as follows:

**INTRODUCTION**

1.     This is an action for actual, punitive, consequential and statutory damages brought by MARY JO PAYNE (hereinafter "Ms. Payne" or "the Plaintiff"), an individual consumer, against Defendant AT&T Corp. ("AT&T"), for fraud, civil conspiracy and violations of the Kentucky Consumer Protection Act KRS § 367.110 *et seq* (hereinafter "KYCPA").  AT&T fraudulently induced Ms. Payne into a contract for services by making material misrepresentations of fact.  Once Ms. Payne discovered these misrepresentations, and cancelled her service, AT&T further fraudulently represented to Ms. Payne that she could return certain

equipment to AT&T, and that she would not owe anything further on her account.  AT&T's series of fraudulent misrepresentations and harassment violated the KYCPA.  AT&T then further violated the KYCPA by engaging in unfair and deceptive practices when it transferred this invalid debt to Defendant Bay Area Credit Service ("Bay Area"), with knowledge that Bay Area would continue collection efforts against Ms. Payne.  After Ms. Payne properly disputed the debt with Bay Area, AT&T conspired with each of the remaining Defendants in a systematic effort to harass and oppress Ms. Payne, all in an to effort collect this invalid debt in violation of the KYCPA, a cognizable independent tort under the law of Kentucky.

2.     Ms. Payne brings a claim against Defendant BAY AREA CREDIT SERVICE LLC. (hereinafter "Bay Area") for fraud and civil conspiracy.  Bay Area conspired with AT&T, in the manner described in paragraph 1, to collect an invalid debt and further committed a fraud when it represented to Ms. Payne that if she notified Bay Area of any dispute of the debt, it would verify the validity of the debt and send verification to Ms. Payne.  Ms. Payne relied on this misrepresentation and notified Bay Area that she disputed the debt. Bay Area then violated Ms. Payne's rights when, instead of either verifying the debt or ceasing debt collection activities, Bay Area remitted this debt to AT&T, knowing that this would result in further collection activities.

3.     Ms. Payne brings a claim against Defendant SOUTHWEST CREDIT SYSTEM LP (hereinafter "Southwest") for fraud and civil conspiracy.   Southwest conspired with Defendant AT&T to collect an invalid debt and further committed a fraud when it represented to Ms. Payne that if she notified Southwest of any dispute of the debt, it would verify the validity of the debt.  Ms. Payne relied on this misrepresentation and disputed the debt. Southwest then

violated Ms. Payne's rights when instead of either verifying the debt or ceasing debt collection activities, Southwest remitted this debt to Defendant AT&T to continue collection activities.

4.     Ms. Payne brings a claim against Defendant AFNI INC. ("AFNI") for fraud, civil conspiracy, and violations of the Fair Debt Collection Practices Act ("FDCPA").   AFNI conspired with Defendant AT&T to collect an invalid debt and further committed a fraud when it represented to Ms. Payne that if she notified AFNI of any dispute of the debt, it would verify the validity of the debt.   Ms. Payne relied on this misrepresentation and notified AFNI that she properly disputed the debt. AFNI then violated Ms. Payne's rights when instead of either verifying the debt or ceasing debt collection activities, AFNI remitted this debt to AT&T to continue collection activities.

5.     Ms. Payne also brings a claim against Defendant IC SYSTEM INC. (hereinafter "IC") for civil conspiracy and violations of the FDCPA.  IC conspired with Defendant AT&T to collect an invalid debt.  IC committed violations of the FDCPA by misrepresenting the character of the debt and engaging in unfair or unconscionable practices.

<u>**PARTIES**</u>

6.     The Plaintiff, Mary Jo Payne, is a citizen and resident of Jefferson County, Kentucky.  The Plaintiff is a "consumer," as that term is defined by 15 U.S.C. § 1692a(3).  The Plaintiff is a "person," as that term is used in 15 U.S.C. § 1692d.  Plaintiff is a "person" as that term is defined in KRS § 367.110(1).

7.     AT&T is a corporation organized and existing under the laws of New York. AT&T's principal place of business is located at One AT&T Way, Bedminster, NJ 07470. Unless otherwise indicated, the use of the Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees,

sureties, representatives, insurers, and subsidiaries of this Defendant named.  Defendant is a "person" who was engaged in "trade or commerce" as those terms are defined under KRS § 367.110.

8.      Bay Area is a corporation organized and existing under the laws of California. Bay Area's principal place of business is located at 1000 Abernathy Road NE, Atlanta, GA 30328-5623.  Unless otherwise indicated, the use of the Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, representatives, and insurers of this Defendant named.  Defendant is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6), and sought to collect a consumer debt from Plaintiff. Defendant is a "person" who was engaged in "trade or commerce" as those terms are defined under KRS § 367.110.

9.      Southwest is a corporation organized and existing under the laws of Texas. Southwest's principal place of business is 4120 International Parkway Suite 1100, Carrollton, TX 75007-1958.  Unless otherwise indicated, the use of the Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, representatives, and insurers of this Defendant named.  Defendant is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6), and sought to collect a consumer debt from Plaintiff.  Defendant is a "person" who was engaged in "trade or commerce" as those terms are defined under KRS § 367.110.

10.     AFNI is a corporation organized and existing under the laws of Illinois.  AFNI's principal place of business is located at 404 Brock Drive, Bloomington, IL 61701. Unless otherwise indicated, the use of the Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties,

representatives, and insurers of this Defendant named.  Defendant is a "debt collector" as that

term is defined by 15 U.S.C. § 1692a(6), and sought to collect a consumer debt from Plaintiff.

Defendant is a "person" who was engaged in "trade or commerce" as those terms are defined

under KRS § 367.110.

11.     IC is a corporation organized and existing under the laws of Pennsylvania.  IC's

principal place of business is located at 444 Highway 96 East, St. Paul, MN   55146-0437.

Unless otherwise indicated, the use of the Defendant's name in this Complaint includes all

agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees,

sureties, representatives, and insurers of this Defendant named.  Defendant is a "debt collector"

as that term is defined by 15 U.S.C. § 1692a(6), and sought to collect a consumer debt from

Plaintiff.  Defendant is a "person" who was engaged in "trade or commerce" as those terms are

defined under KRS § 367.110.

## JURISDICTION AND VENUE

12.     Jurisdiction is conferred on this Court pursuant to 15 U.S.C. § 1692k(d), which

states that actions arising under the FDCPA may be brought and heard before "any appropriate

United States district court without regard to the amount in controversy."

13.     This Court also has supplemental jurisdiction over the state law claims presented

herein, pursuant to 28 U.S.C. § 1367, as said state law claims arise from the same common

nucleus of operative facts as the FDCPA claims alleged herein.

14.     Jurisdiction is further conferred on this Court pursuant to 28 U.S.C. § 1332(a), as

complete diversity exists between Plaintiff and Defendants, and the amount in controversy

exceeds the jurisdictional limits of this court.

15.     This Court has personal jurisdiction over AT&T.  The Defendant conducts

business in the Commonwealth of Kentucky; the Defendants purposefully contacted the Plaintiff,

who resides within the Commonwealth of Kentucky, for purpose of selling goods or services to the Plaintiff. The Defendant further contacted the Plaintiff in an effort to collect a debt allegedly owed by the Plaintiff. The Defendant also maintains a registered agent in the Commonwealth of Kentucky.

16.     This Court has personal jurisdiction over Bay Area. The Defendant conducts business in the Commonwealth of Kentucky; the Defendants purposefully contacted the Plaintiff, who resides within the Commonwealth of Kentucky, in an effort to collect a debt allegedly owed by the Plaintiff. Through information and belief, Defendant Bay Area purposefully contacts many Kentucky consumers to attempt to collect consumer debts.

17.     This Court has personal jurisdiction over Southwest. The Defendant conducts business in the Commonwealth of Kentucky; the Defendants purposefully contacted the Plaintiff, who resides within the Commonwealth of Kentucky, in an effort to collect a debt allegedly owed by the Plaintiff. The Defendant also maintains a registered agent in the Commonwealth of Kentucky.

18.     This Court has personal jurisdiction over IC. The Defendant conducts business in the Commonwealth of Kentucky; the Defendant purposefully contacted the Plaintiff, who resides within the Commonwealth of Kentucky, in an effort to collect a debt allegedly owed by the Plaintiff. The Defendant also maintains a registered agent in the Commonwealth of Kentucky.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(2), as "a substantial part of the events or omissions giving rise to the claim[s]" herein occurred within this District.

## **FACTS**

20.     The Plaintiff has, at all times relevant, resided in Jefferson County, Kentucky.

21.   Ms. Payne is a 65 year old retired Catholic school teacher.  Ms. Payne was forced into an early retirement during the early 90s due to recurring problems from a near fatal bout with cancer.

22.   Ms. Payne is on disability due to complications from her illness.  Ms. Payne spends most of her time volunteering at a center for developmentally challenged adults run by a Catholic nun in Middletown.

23.   On or about the November 11, 2010, Ms. Payne was solicited by AT&T salespersons going door-to-door in her neighborhood.

24.   The AT&T salespersons represented to Ms. Payne that if she switched her current cable service, phone, and cell phone, to AT&T Uverse, it would save her $100 a month.

25.   Ms. Payne asked to speak to a supervisor via phone, who also represented to Ms. Payne that if she switched her service to AT&T Uverse she would save $100 a month.

26.   When Ms. Payne received her first bill from AT&T, she found that it was $100 higher than had been represented by the salespersons and supervisor who had solicited her.

27.   Upon further review, she determined that this was due to fees, surcharges, taxes, and other amounts that neither AT&T's door-to-door salespersons nor their supervisor had disclosed.

28.   Ms. Payne also immediately experienced problems with the services as well, including low-quality landline phone service, and difficulty with her internet and cable.

29.   Ms. Payne placed multiple phone calls to AT&T and was eventually able to cancel her service on or about December 15, 2010.

30.     During the conversation in which she cancelled her service, an AT&T representative told Ms. Payne that if she would agree to keep her AT&T cell phone service that AT&T would write off all charges and cancel her other services.

31.     AT&T told Ms. Payne that she needed to return her AT&T equipment to a UPS store in order to avoid being charged a fee for the equipment.

32.     Through information and belief, AT&T and UPS have a contractual arrangement whereby AT&T equipment can be returned to UPS, who will then deliver to AT&T free of charge to the consumer.

33.     In accordance with AT&T's instructions, Ms. Payne went to the UPS store located at 974 Breckenridge Lane, Louisville, Kentucky 40207 and returned her equipment on December 23, 2010.

34.     Ms. Payne brought to the UPS store all of the equipment that AT&T had provided to her.  These units had serial numbers that were confirmed by UPS, and Ms. Payne was provided with a tracking number.

35.     In accordance with AT&T's instructions, Ms. Payne provided the above items to the UPS store to be returned to AT&T.  All items were listed by UPS as being in good condition. A true and accurate copy of a document issued by UPS reflecting the same is attached hereto as Exhibit 1.

36.     The UPS store accepted the items and at 2:41 pm issued Ms. Payne a receipt for the items.  A true and accurate copy of this receipt is attached hereto as Exhibit 2.

37.     On the same day, UPS issued a shipping receipt to Ms. Payne.  A true and accurate copy of the shipping receipt is attached hereto as Exhibit 3.

38. Despite the fact that Ms. Payne followed AT&T's instructions, on or about February 23, 2011, AT&T sent Ms. Payne a letter demanding payment of $477.00. A true and accurate copy of the February 23, 2011, letter from AT&T is attached hereto as Exhibit 4.

39. The February 23, 2011, letter from AT&T indicated, in part:

"If we have a credit card on file, your card may be charged for the outstanding balance due including $150 for each piece of leased equipment not returned to an authorized UPS store within 21 days of your disconnect date."

See Exhibit 4.

40. Shortly after receiving the letter, Ms. Payne called AT&T to inquire about AT&T's claim that she owed them $477.00, as she had returned the equipment to an authorized UPS store within 21 days.

41. During this conversation, AT&T told Ms. Payne that she owed them $477 due to Ms. Payne's alleged failure to return the equipment.

42. Ms. Payne told AT&T that she had done everything AT&T instructed regarding the return of the equipment.

43. AT&T told Ms. Payne that she would have to contact UPS to resolve the matter.

44. In accordance with AT&T's instructions, Ms. Payne contacted UPS by phone.

45. After spending time discussing the matter with UPS representatives, UPS told Ms. Payne that since Ms. Payne had turned in the equipment, there was nothing more UPS could do about the issue.

46. UPS could not locate the equipment within their store.  Ms. Payne reasonably believed that it was likely that a simple mistake had been made, and that the equipment must be en route to AT&T.

47.     However, on March 29, 2011, AT&T sent Ms. Payne a second letter telling her again that she owed AT&T $477.00 for the equipment she supposedly had not returned to UPS. A true and accurate copy of the March 29, 2011, letter is attached hereto as Exhibit 5.

48.     The March 29, 2011, letter from AT&T indicated, in part:

> "If we have a credit card on file, your card may be charged for the outstanding balance due including $150 for each piece of leased equipment not returned to an authorized UPS store within 21 days of your disconnect date."

See Exhibit 5.

49.     On April 4, 2011, Ms. Payne contacted AT&T by phone and again informed AT&T by that she had returned the equipment to UPS as AT&T had instructed, and had receipts and a tracking number to prove the same.  AT&T placed Ms. Payne on hold.

50.     After being on hold for some time, AT&T told Ms. Payne that the tracking number was wrong, but that AT&T had located one piece of equipment.

51.     AT&T never sent another bill reflecting that one piece of equipment had been located and lowering the amount Ms. Payne allegedly owed.

52.     After the April 4, 2011, conversation AT&T ceased contact with Ms. Payne, and Ms. Payne believed that the issue had been resolved.

53.     On April 13, 2011, Bay Area sent Ms. Payne a letter informing Ms. Payne that her AT&T account has been placed with them for collection.  A true and accurate copy of the April 13, 2011, letter from Bay Area is attached hereto as Exhibit 6.

54.     Through information and belief, AT&T maintained or maintains a contractual arrangement with Bay Area to collect accounts on behalf of AT&T.

55.     AT&T receives or received financial benefits from Bay Area on accounts collected by Bay Area.   Bay Area receives or received financial benefits from AT&T for collecting on accounts placed with Bay Area for collection.

56.     On the back of the April 13, 2011, letter from Bay Area, there was a "consumer rights" notification that read, in part, as follows: "If you notify this office within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt…" See Exhibit 6.

57.     Within 30 days of receiving the letter Ms. Payne called Bay Area in order to dispute the validity of the debt.

58.     Ms. Payne wanted to dispute the debt with Bay Area because she did not believe that she owed it, and was frustrated, aggravated and confused that she was being contacted by a collector regarding this debt.

59.     Ms. Payne informed Bay Area that she did not owe a debt to AT&T.  Bay Area asked Ms. Payne if she could prove that the debt was invalid.  Ms. Payne responded that she could.

60.     After speaking with Bay Area by phone, Ms. Payne sent a letter to Bay Area disputing the debt. Ms. Payne attached receipts confirming that she had returned AT&T's equipment.

61.     Ms. Payne believed that Bay Area would review the information and contact her regarding whether the debt was valid.

62.     Through information and belief, Bay Area did not conduct an adequate investigation into the validity of the debt.

63.     Despite the language on the letter, Bay Area never sent verification of the debt to Ms. Payne, but instead ceased contact with Ms. Payne.

64.     On information and belief, Bay Area then remitted this debt to AT&T, without sufficient notation as to the fact that the debt was invalid, and with knowledge that AT&T would continue collection efforts on Ms. Payne's non-existent debt, or with reckless disregard for whether AT&T would continue collection efforts against Ms. Payne.

65.     On July 14, 2011, Southwest sent Ms. Payne a collection letter informing her that her account had been placed with them for collections by AT&T. A true and accurate copy of the July 14, 2011, letter from Southwest is attached hereto as Exhibit 7.

66.     The Southwest letter included a notation that a $85.86 collection fee had been added to her account. See Exhibit 7.

67.     The July 14, 2011, letter from Southwest included a notification that read, in part, as follows: "If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt…" See Exhibit 7.

68.     Within 30 days of receiving the letter, and in order to comply with the notice contained in Southwest's letter, Ms. Payne sent a letter to Southwest, disputing the debt, and attached UPS receipts confirming that she had returned AT&T's equipment.

69.     Ms. Payne believed that Southwest would review the information and contact her regarding whether the debt was valid.

70.     Through information and belief, Southwest did not conduct an adequate investigation into the validity of the debt.

71.     Despite the language on the letter, Southwest never sent verification of the debt to Ms. Payne, and ceased contact.

72.     On information and belief, Southwest then remitted this debt to AT&T, without sufficient notation as to the fact that the debt was invalid, and with knowledge that AT&T would continue collection efforts on Ms. Payne's non-existent debt, or with reckless disregard for whether AT&T would continue collection efforts against Ms. Payne

73.     On July 10, 2012, AFNI sent Ms. Payne a collection letter informing her that her account had been placed with them for collection. A true and accurate copy of the July 10, 2012, letter from AFNI is attached hereto as Exhibit 8.

74.     The July 10, 2012, letter from AFNI included a notification that read, in part, as follows: "If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt…" See Exhibit 8.

75.     The letter from AFNI included a notation that a $85.86 collection fee had been added to her account. See Exhibit 8.

76.     Within 30 days of receiving the letter, and in order to comply with the notice contained in AFNI's letter, Ms. Payne sent a letter to AFNI, via certified mail, disputing the debt, and attached the UPS receipts confirming that she had returned AT&T's equipment.  A true and accurate copy of the certified mail receipt is attached hereto as Exhibit 9.

77.     Ms. Payne believed that AFNI would review the information and contact her regarding whether the debt was valid.

78.     Through information and belief, AFNI did not conduct an adequate investigation into the validity of the debt.

79.     Despite the language on the letter, AFNI never sent verification of the debt to Ms. Payne, and ceased contact.

80.     On information and belief, AFNI then remitted this debt to AT&T, without sufficient notation as to the fact that the debt was invalid, and with knowledge that AT&T would continue collection efforts on Ms. Payne's non-existent debt, or with reckless disregard for whether AT&T would continue collection efforts against Ms. Payne

81.     On January 5, 2013, IC sent Ms. Payne a collection letter informing her that her account had been placed with them for collection.  A true and accurate copy of the January 5, 2013, letter from IC is attached hereto as Exhibit 10.

82.     The January 5, 2013, letter included a notation that a $85.86 collection charge had been added to her account.

83.     Ms. Payne called IC in response to this letter, and was informed by a person named "Mariah" that, if Ms. Payne would pay $255.00 of the $477.00, the account would be "taken out of collection," and that AT&T would then consider the matter settled with Ms. Payne.

84.     The actions of the Defendants, individually and collectively, have caused the Plaintiff to suffer undue and unnecessary embarrassment and humiliation, and unnecessary stress and expense by virtue of the fact that the Defendants have conspired to subject Ms. Payne to an onslaught of different parties attempting to collect on a debt that Ms. Payne never owed.

85.     Ms. Payne became extremely distraught in the face of this never-ending deluge of debt collectors, and felt powerless to remedy her situation.

86.     Through information and belief, the Defendants individually and or collectively do not maintain an adequate system of procedures to properly note disputed debt and to avoid having continued collection efforts on accounts which have been disputed by consumers.

## COUNT I
## AT&T
### (Kentucky Consumer Protection Act KRS § 367.110, *et seq.*)

87.    The allegations in the above paragraphs of this complaint are realleged and incorporated herein by this reference.

88.    The Kentucky Consumer Protection Act declares that "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  For purposes of this chapter, unfair also means "unconscionable."  KRS § 367.170.

89.    Ms. Payne purchased goods or services from AT&T primarily for personal, family or household purposes.

90.    AT&T engaged in "unfair, false, misleading, or deceptive acts or practices" when its agents or employees failed to inform Ms. Payne of certain fees and charges that were going to be added to her account.

91.    AT&T further engaged in "unfair, false, misleading, or deceptive acts or practices" when it falsely indicated to Ms. Payne that if she returned her equipment to an authorized UPS store, that they would not charge her any further.

92.    AT&T further engaged in "unfair, false, misleading, or deceptive acts or practices" by continuing to attempt to collect from Ms. Payne after she returned the equipment to an authorized UPS store, and after she provided proof to AT&T that she had done so.

93.    AT&T further engaged in "unfair, false, misleading, or deceptive acts or practices" by repeatedly transferring her account to multiple collection agencies, with knowledge that Ms. Payne had disputed the validity of the debt.

94.    Ms. Payne has suffered an ascertainable loss of time, money and enjoyment due to the actions of AT&T.

95.     AT&T actions were sufficiently egregious to warrant the imposition of punitive damages.

## COUNT II
## Fraud
## (AT&T, Bay Area, Southwest, AFNI, IC)

96.     The allegations in the above paragraphs of this complaint are realleged and incorporated herein by this reference.

97.     AT&T committed fraud when its agents represented to Ms. Payne that by switching her cable service to AT&T Uverse she would save $100 a month.

98.     This statement was a material misrepresentation that was false and that AT&T either knew was false or made with reckless disregard for its truth or falsity.

99.     AT&T made the statement to induce Ms. Payne into purchasing their services.

100.    Ms. Payne reasonably relied on this misrepresentation to her detriment.

101.    Injury has been caused both because of Ms. Payne's higher bills, expenses and time spent dealing with the consequences AT&T's misrepresentation, and the mental anguish inflicted on Ms. Payne flowing from AT&T's fraudulent act.

102.    The Defendant, AT&T, AT&T committed a second fraud when its agents represented to Ms. Payne that her problems were with UPS, and not with AT&T.

103.    This statement was a material representation, as Ms. Payne then began to focus on UPS as the source of her problems, and not AT&T.

104.    This statement was patently false; Ms. Payne had fulfilled her obligations by returning her equipment to UPS as required.

105.    On information and belief, AT&T and UPS have a contract whereby UPS will serve as a drop-off location for Uverse equipment, and UPS will ship this equipment to AT&T.

106.    The agent who made this statement made the statement with reckless disregard for its truth or falsity, or committed the fraud with intent.

107.    The statement was likely to induce a reasonable person to go to UPS to discover the source of the problem.

108.    The fraudulent statement also caused injury, as Ms. Payne refrained from trying further to get the issue settled with AT&T, and caused her additional mental distress, grief, time and expense, and confusion.

109.    The Defendant debt collectors (Bay Area, Southwest, AFNI, and IC) respective offers to verify the debt were material misrepresentations.

110.    The defendant debt collectors made these misrepresentations with reckless disregard for whether they actually intended to send verification to Ms. Payne.

111.    The statements were only made to induce Ms. Payne to contact the respective debt collectors, in order for them to attempt to collect the debt.

112.    When it became clear that Ms. Payne was going to dispute the debt, the Defendant debt collectors transferred the debt.

113.    The Defendant debt collectors further committed fraud by attempting to collect a debt that AT&T could not legally collect.

114.    Ms. Payne has suffered losses stemming from this fraud in the form of loss of time and money as well as mental anguish and distress.

## COUNT III
## Civil Conspiracy
### (AT&T, Bay Area, Southwest, AFNI, IC)

115.    The allegations in the above paragraphs of this complaint are realleged and incorporated herein by this reference.

116.    AT&T and Bay Area had an agreement that Bay Area Credit would provide to AT&T and its affiliates, in exchange for specified compensation, services for the collection of delinquent accounts referred to Bay Area Credit by AT&T or its affiliates.

117.    Sometime between March 29, 2011, and April 13, 2011, AT&T transferred the invalid debt to Bay Area in order for Bay Area to attempt to illegally collect from Ms. Payne.

118.    On information and belief, once Ms. Payne disputed the debt with Bay Area, Bay Area remitted the debt to AT&T, with actual knowledge or reckless disregard for the fact that AT&T would continue to attempt to collect on the account.

119.    This was a violation of the KYCPA.  By conspiring to illegally collect from Ms. Payne, Bay Area committed an independently tortious act under Kentucky law.

120.    Sometime between April 11, 2011, and July 14, 2011, AT&T transferred Ms. Payne's invalid debt to Defendant Southwest.

121.    On information and belief, once Ms. Payne disputed the debt with Southwest, Southwest remitted the debt to AT&T, with actual knowledge or reckless disregard for the fact that AT&T would continue to attempt to collect on the account.

122.    This was a violation of the KYCPA.  By conspiring with AT&T to illegally collect from Ms. Payne, Southwest committed an independently tortious act under Kentucky law.

123.    Sometime between July 14, 2011, and July 10, 2012, AT&T transferred Ms. Payne's invalid debt to Defendant AFNI.

124.    As set forth herein, AFNI violated Ms. Payne's rights under the FDCPA.

125.    AT&T transferred the debt to AFNI with knowledge that the debt was invalid and that AFNI's collection efforts would violate the FDCPA.

19

126.    On information and belief, once Ms. Payne disputed the debt with AFNI, AFNI remitted the debt to AT&T, with actual knowledge or reckless disregard for the fact that AT&T would continue to attempt to collect on the account.

127.    This was a violation of the KYCPA.  By conspiring with AT&T to illegally collect from Ms. Payne, AFNI committed an independently tortious act under Kentucky law.

128.    Sometime between July 10, 2012, and January 5, 2013, AT&T transferred Ms. Payne's invalid debt to Defendant IC.

129.    As set forth herein, IC violated Ms. Payne's rights under the FDCPA.

130.    AT&T transferred the debt to IC with knowledge that the debt was invalid and that IC's collection efforts would violate the FDCPA.

131.    This was also violation of the KYCPA.  By conspiring with AT&T to illegally collect from Ms. Payne, IC committed an independently tortious action under Kentucky law.

## COUNT IV
## AFNI
### (Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*.)

132.    The allegations in the above paragraphs of this complaint are realleged and incorporated herein by this reference.

133.    The statute of limitations under the FDCPA is one year from the date on which the violation occurs.  15 U.S.C. § 1692k(d).  AFNI's collection letter is dated July 10, 2012.

134.    AFNI violated 15 U.S.C. § 1692e(2)(A) when they attempted to collect a debt that Ms. Payne did not legally owe.

135.    After AT&T discovered one piece of the equipment that Ms. Payne had allegedly not returned, AT&T never adjusted the amount to reflect the value of that admittedly returned equipment.

136.    AFNI violated 15 U.S.C. § 1692g(b) when they transferred Ms. Payne's debt in order for AT&T to continue to attempt to collect on the debt.

137.    1692g(b) declares that "the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment" and ensures that the verification is mailed to the consumer.

138.    Congress considered verification to be among the most important features of the FDCPA, stating that "[t]his provision will eliminate the recurring problem of collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." S. Rep. No. 382, 95th Cong., 1st Sess. 4, at 4, reprinted in 1977 U.S.C.C.A.N. 1695, 1696. See also Udell, FTC Informal Staff Lettter (Jan. 20, 1987). Through information and belief, AFNI knew or was aware that AT&T's practice was to continue collection efforts on accounts, such as Ms. Payne's, that had been disputed.

139.    This transfer of the debt is a collection activity, and is barred by the FDCPA until verification is mailed to the consumer.

140.    This action also violated §1692f, which prohibits "unfair or unconscionable means to collect or attempt to collect any debt." The United States Senate has stated that "this bill prohibits in general any harassing, *unfair, or deceptive collection practice*. This will enable the courts, where appropriate, to proscribe other improper conduct which is not specifically addressed." S. Rep. No. 382, 95th Cong., 1st Sess. 4, at 4, *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696(emphasis supplied).

141.    Through information and belief AFNI was aware of, or had access to, records that indicated that Ms. Payne's account had been previously disputed.

142.     Transferring a disputed debt in order for collection activity to continue, without verifying the debt as required by law, is both unfair and deceptive.

143.     The Defendant violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect or attempt to collect any debt by engaging in the conduct set forth in this Complaint, including but not limited to, the following:

    a.   Engaging in a scheme whereby Ms. Payne's invalid debt would continue to attempt to be collected without regard for its validity.

    b.   Continuing the unfair, unconscionable and outrageous conduct described herein, with actual knowledge that the debt was disputed.

144.     Ms. Payne has suffered losses stemming from these actions in the form of loss of time and money as well as mental anguish and distress.

## COUNT V
## IC SYSTEM
### (Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*)

145.     The allegations in the above paragraphs of this complaint are realleged and incorporated herein by this reference.

146.     The statute of limitations under the FDCPA is one year from the date on which the violation occurs.  15 U.S.C. § 1692k(d).  IC's collection letter is dated January 5, 2013.

147.     IC violated 15 U.S.C. § 1692e(2)(A) when they attempted to collect a debt that Ms. Payne did not legally owe.

148.     After AT&T discovered one piece of the equipment that Ms. Payne had allegedly not returned, AT&T never adjusted the amount to reflect the value of that admittedly returned equipment.

149.   IC violated the FDCPA when it, through an agent named "Mariah," misrepresented the character of Ms. Payne's alleged debt as still belonging to AT&T, and that if she were to pay a portion of the debt, AT&T would settle the debt with Ms. Payne.  This is a violation of 15 § U.S.C. § 1692e(2)(A).

150.   § 1692e generally forbids "any false, deceptive, or misleading representation or means in connection with the collection of any debt."   IC's statement was false, deceptive, or misleading.

151.   This transfer of the debt is a collection activity, and is barred by the FDCPA until verification is mailed to the consumer.

152.   Through information and belief IC was aware of, or had access to, records that indicated that Ms. Payne's account had been previously disputed.

153.   This action also violated §1692f, which prohibits "unfair or unconscionable means to collect or attempt to collect any debt."  The United States Senate has stated that "this bill prohibits in general any harassing, *unfair, or deceptive collection practice*.  This will enable the courts, where appropriate, to proscribe other improper conduct which is not specifically addressed."  S. Rep. No. 382, 95th Cong., 1st Sess. 4, at 4, *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696(emphasis supplied).

154.   Transferring a disputed debt in order for collection activity to continue, without verifying the debt as required by law, is both unfair and deceptive.

155.   The Defendant violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect or attempt to collect any debt by engaging in the conduct set forth in this Complaint, including but not limited to, the following:

    a. Engaging in a scheme whereby Ms. Payne's invalid debt would continue to attempt to be collected without regard for its validity.

    b. Continuing the unfair, unconscionable and outrageous conduct described herein, with actual knowledge that the debt was disputed.

    c. Attempting to induce Ms. Payne to pay on this invalid debt through misrepresentation despite the fact that the Defendant either know, or should have known, that the debt was invalid.

156. Ms. Payne has suffered losses stemming from these actions in the form of loss of time and money as well as mental anguish and distress.

**WHEREFORE,** the Plaintiff, Mary Jo Payne, having set forth her claims for relief against the Defendants, respectfully request judgment be entered against the Defendants, for the following:

    A. That the Plaintiff have and recover against the Defendant, statutory damages of $1,000.00 for each violation of the Fair Debt Collection Practices Act;

    B. That the Plaintiff have and recover against the Defendant a sum to be determined in the form of actual and consequential damages;

    C. That the Plaintiff have and recover against the Defendant, costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1692k of the Fair Debt Collection Practices Act, as well as KRS § 367.220 of the Kentucky Consumer Protection Act;

    D. Punitive damages for fraudulent actions taken by the Defendants

    E. Punitive damages for conspiratorial actions taken by the Defendants

    F. Any and all other relief that this Honorable Court deems appropriate.

    G. Prejudgment and Postjudgment interest on all damages where appropriate.

## **DEMAND FOR JURY TRIAL**

PLEASE TAKE NOTICE that Plaintiff, MARY JO PAYNE, demands a jury trial in this case.

DATED: 3/29/2013

/s/ John. S. Friend
J.S.Friend
Robert, W. "Joe" Bishop
Bishop & Associates, P.S.C.
6520 Glenridge Park Place, Suite 6
Louisville, KY  40222
Phone: 502.425.2600
firm@bishoplegal.net
